# EXHIBIT A

**NEW YORK STATE EDUCATION DEPARTMENT**
-----------------------------------------------------------------------X

**In the Matter of the Charges preferred by**    )
                                                 )
**DEPARTMENT OF EDUCATION OF THE**               )
**CITY OF NEW YORK,**                            )
                                                 )
         **"Complainant-Employer"**       )
                                                 )
      **-against –**                        )    **SED Case Nos. 31998**
                                                 )        **(Primary)**
**JESSICA PETERSON**                             )        **31465**
                                                 )       **(Secondary)**
     **"Respondent-Tenured Teacher"**       )
                                                 )
**Pursuant to Education Law Section 3020(a).**   )
-----------------------------------------------------------------------X

APPEARANCES

    For the Department

        Howard Friedman, Esq., General Counsel to the Chancellor
        By:  Myriam Berardino, Esq.
            Catherine Sam, Esq.

    For the Respondent

        Robert T. Reilly, Esq.
        By:  Christopher Lewis, Esq.

BEFORE

    Mary J. O'Connell, Esq., Hearing Officer

The Department preferred Charges against Respondent, Jessica Peterson, a tenured teacher assigned to Tottenville High School in Staten Island, New York. By notices from the New York State Education Department, I was appointed Hearing Officer.

Prehearing conferences were held on August 22, 2017 (SED No. 31465) and October 31, 2017 (SED No. 31998). At that time, any outstanding issues concerning discovery were resolved.

The cases were consolidated and hearings on the both sets of specifications against the Respondent took place on January 11, 2018, January 16, 2018, January 26, 2018, January 31, 2018, February 5, 2018, February 8, 2018, February 12, 2018, February 13, 2018, March 2, 2018 March 5, 2018, March 19, 2018 and March 20, 2018 at the offices of the Department in New York, New York. The parties took full opportunity to introduce evidence and argument in support of their respective positions. A stenographic record of the hearing was taken. After the parties' summations, the record was declared closed pending my receipt of the hearing transcript. All of the parties' arguments have been duly considered even if not specifically referenced herein

## DISCUSSION AND FINDINGS

**The Specifications**

The Specifications against Respondent read as follows:

SED No. 31465:

## SPECIFICATIONS

**JESSICA PETERSON** (hereafter referred to as "Respondent") under File # 0719456, is a tenured teacher assigned to Tottenville High School, 31R455, located in Richmond County, within District 31. During the 2015-2016 and 2016-2017 school years, Respondent engaged in

2

verbal abuse, inappropriate comments, neglect of duty and conduct unbecoming her position as follows:

## In Particular:

**SPECIFICATION 1:** On or about and between February 29, 2016 and March 4, 2016, Respondent stated, on one or more occasions to one or more students,* in sum and substance:

    a. Bat shit crazy.
    b. That Student A * was bat shit crazy.
    c. That Student A was bat shit crazy for going on vacation.
    d. That Student A was bat shit crazy for going on vacation without advising Respondent.
    e. That girl [referring to Student A ] must be bat shit crazy.
    f. That if anyone thought they were going to go on vacation and make up the work they were bat shit crazy.

**SPECIFICATION 2:** On or about March of 2016, Respondent stated to one or more students, in sum and substance, that it is bat shit crazy if they did not begin a project yet.

**SPECIFICATION 3:** On or about February 14, 2017 Respondent:

    a. Pointed a cell phone at one or more students.*
    b. Caused one or more students to believe she was taking photos of them.
    c. Caused one or more students to feel uncomfortable and/or nervous.

## The foregoing constitutes
- Just cause for disciplinary action pursuant to Education Law Section 3020-a;
- Neglect of duty;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;
- Verbal abuse;
- Inappropriate comments;
- A violation of the by-laws, rules and regulations of the Chancellor, Department, School and/or District;
- Misconduct;
- Substantial cause that renders Respondent unfit to perform her obligations properly to the service; and
- Just cause for termination.

*Student name will be provided prior to trial.

(DOE Exhibit 1)

SED No. 31998:

3

# SPECIFICATIONS

Jessica Peterson (hereafter referred to as "Respondent") under File # 0719456, is a tenured teacher assigned to Tottenville High School, Community District 31, in Staten Island. During the 2007-2008 school year to the present, Respondent engaged criminal conduct and conduct unbecoming her position as follows:

## In Particular:

**SPECIFICATION 1:** On or about September 2007, Respondent intentionally created and/or possessed and submitted a forged document containing false information to the Department of Education with the intent to defraud the Department of Education by improperly obtaining accommodations that the Respondent was not entitled to namely: secured locked cabinets to avoid carrying teaching/testing materials and or supplies; to not share a classroom with other teachers; delivery of all required proctoring materials for exams; to avoid hall passing; not subjecting accommodations to annual review.

**SPECIFICATION 2:** As a result of the Respondent submitting the above-described forged document containing false information, on or about and between September 2007 and September 2016, Respondent received accommodations that the Respondent was not entitled to namely: secured locked cabinets to avoid carrying teaching/testing materials and or supplies; to not share a classroom with other teachers; delivery of all required proctoring materials for exams; to avoid hall passing; not subjecting accommodations to annual review.

**SPECIFICATION 3:** On or about August 22, 2016, Respondent intentionally created and/or possessed and submitted a forged document containing false information to Principal Joseph Scarmato with the intent to defraud the Department of Education by improperly obtaining medical accommodations that the Respondent was not entitled to namely: secured locked cabinets to avoid carrying teaching/testing materials and or supplies; to not share a classroom with other teachers; delivery of all required proctoring materials for exams; to avoid hall passing; not subjecting accommodations to annual review.

**SPECIFICATION 4:** On or about October 17, 2016, Respondent intentionally created and/or possessed and submitted a forged document containing false information to the Medical Division of the Department of Education with the intent to defraud the Department of Education by improperly obtaining medical accommodations that the Respondent was not entitled to namely: secured locked cabinets to avoid carrying teaching/testing materials and or supplies; to not share a classroom with other teachers; delivery of all required proctoring materials for exams; to avoid hall passing; not subjecting accommodations to annual review.

## The foregoing constitutes

- Just cause for disciplinary action pursuant to Education Law Section 3020-a;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order,

efficiency, or discipline of the service;
- Substantial cause that renders Respondent unfit to perform her obligations properly to the service;
- Misconduct;
- Criminal conduct
- Just cause for termination.

(DOE 2)


## Positions of the parties

The Department argues that this is not a case of anti-union animus, but a case of forgery, verbal abuse and professional misconduct. It asserts that there is no question that the seventeen witnesses it called were experienced, highly qualified individuals. They gave detailed, vivid and consistent testimony regarding three separate incidents which form the basis of the charges against the Respondent. In contrast, the Respondent rambled, was evasive, disingenuous, and repeatedly answered a question with a question. She tailored her testimony to the evidence adduced, but did not establish a basis that exculpated her from the charges.

The Department submits that the Respondent created and forged a six bullet-point accommodation letter on or about August 22, 2016. It is significant that no one but Ms. Peterson had the six point letter. In comparing the three point letter to the six point letter, one does not need expert testimony to know that no person can sign their name exactly the same way twice. Here, an exact replica of a signature can only indicate one thing – forgery.

The signatures of Yvonne M. Joseph on both letters are identical. This is demonstrated by the identical spacing between the letters in each part of Ms. Joseph's name, and a myriad of other ways in which the signatures are identical. The forgery is further demonstrated when a transparency of the six point letter is placed on the three point letter: the signatures in both letters align. Moreover, the font used in the words "elevator access" is completely different from the

of the font in the six point letter.

The Department maintains that because forgery is by definition a crime, the three year statute of limitations applicable in 3020-a charges does not apply, and the charges concerning conduct in 2007 should be heard on the merits.

The Department submits that the accommodation of not sharing a classroom contained in the six point letter could not have been honored by the administration because it would have created an undue hardship. Had that accommodation been granted, and Principal Tuminaro disregarded it, the Respondent would have been the first person to contact the Office of Equal Opportunity (OEO). Moreover, one cannot disregard the testimony of three independent administrators who each questioned this point. It notes that  William Brewton, who retired from OEO after twenty years questioned why such an accommodation would be granted in an e-mail to Principal Scarmato on August 25, 2016. Logic dictates that if the accommodation of not sharing a classroom had, in fact, been granted, the Respondent would not have had to share a classroom with other teachers.  However, it is uncontroverted that she shared a classroom for at least seven years between the 2008-2009 and the 2016-2017 school years.

The Department notes that Principal Tuminaro had direct knowledge about the Respondent's accommodation in 2007.  He did not hesitate in saying that he had seen the three point letter in 2007.  He had no doubt that he had never seen the six point letter until 2018. His testimony was powerful, authoritative and commanding when he stated that two things caught his eye in the six point letter: it would have been very, very difficult to facilitate not sharing a classroom, and avoiding hall passing.  By contrast, Principal Tuminaro testified that the accommodations in the three point letter were not burdensome.  Taking Principal Tuminaro's testimony to its logical conclusion, the six point letter is forged because he would not have been

able to honor the accommodation to not share a classroom with other teachers, or to avoid hall passing. Further, the evidence demonstrates that Ms. Roth from the Medical Division contacted Principal Tuminaro, not the Respondent, to determine whether the accommodation would present an undue hardship to the school.

Deputy Superintendent Joseph Zaza also questioned not sharing a classroom, testifying that it would be uncommon for a school to accommodate that request because of the sheer size of the student population and the difficulties with leaving a room vacant for half a day. Principal Scarmato pointed out the hardship to the school of 200 teachers and 4,000 students with such a request. AP Reynolds testified as to the impact, using the classroom grid. The fact that so many witnesses questioned the validity of the not sharing a classroom point is no coincidence.

The Department maintains that the timeline of the actions which he took after the Respondent submitted the six point letter shows that Principal Scarmato was not targeting her. In an e-mail sent to the OEO three days after the Respondent submitted the six bullet point letter, Principal Scarmato expressed his concern over the point of not having to share a classroom with other teachers. Mr. Brewton of the OEO suggested contacting the Medical Division after stating that he did not know why an accommodation of that nature was granted. Principal Scarmato then wrote the Medical Division stating that not being able to assign an additional teacher to a classroom creates a hardship in programming. After the Respondent e-mailed the Medical Division, Mr. Darien pulled the Respondent's file. The file contained only the three point letter. Had the six point letter been issued, it would have been attached to the file, and had the words "amended" on the top. Mr. Darien noted that the six point letter lacked the standard language that the accommodation was subject to annual review.

On September 15, 2016, Mr. Darien exchanged e-mails with the disability coordinator at

the OEO, Ms. Udoh, who informed him that the three point letter was the only letter in the Respondent's file. The letter in the OEO file was date-stamped September 24, 2007, six days after the accommodation letter was issued.

It was Ms. Udoh who contacted her supervisor suggesting that the Respondent may have engaged in fraudulent activity by fabricating a document to obtain accommodations to which she as not entitled. The supervisor then forwarded the e-mail to SCI. Deputy Superintendent Zaza had contacted SCI for the same reason.

The Department contends that Ms. Udoh was credible and consistent, outlining seven reasons why she believed that the six point letter had been forged. Among those reasons was that no one signs their name the same way twice. The Department point out that when she was confronted with her own signatures, the Respondent became evasive.

The Department notes that during the course of its investigation, SCI asked the Respondent for any correspondence or documents regarding the 2007 accommodation. The investigator testified that the Respondent told him she would look for the documents, but provided nothing. It makes no sense that the Respondent would have thrown out this important document.

As to the question of why the Respondent would request her medical file in October, 2016, prior to being interviewed by SCI, knowing she forged the six point letter, the Department offers that the Respondent never counted on the Medical Division keeping such accurate documentation for a period of ten years. According to the Department, the Respondent is the only individual who had anything to lose in this proceeding. She is the only person who benefitted from the six point letter.

The Department maintains that the documents contained in its Exhibit 25 are the

proverbial nail in the coffin of the Respondent's case. The documents, such as the Respondent's reasonable accommodation request and supporting documentation filed by her doctor, the e-mails between Ms. Roth and Principal Tuminaro and the three point accommodation letter make clear that the Respondent requested four accommodations: a permanent classroom, no changing of classrooms, no carrying belongings, and a secure closet or cabinet for storage, to avoid lifting teaching materials. Her doctor made the same accommodation requests. Ultimately, all the requests were granted. Further, neither the Respondent nor her doctor made additional accommodation requests when the doctor was asked by DOE Medical for follow-up information. There is no documentary evidence supporting any of the additional accommodations found in the forged six point letter.

The Department highlights Principal Tuminaro's testimony and the e-mails between him and Gwen Roth discussing the Respondent's proposed accommodation, noting that his September 6, 2007 reply specifically discussed the classroom, that he would provide a locked cabinet and that all teachers had elevator access. The Department asks that I look at the timing and the content of the September 17, 2007 e-mail and the issuance of the September 18, 2007 accommodation letter. The accommodations contained in the three point letter dated the day after the e-mail communication between Principal Tuminaro and Ms. Roth were exactly those which the Respondent requested on June 26, 2007, with the exception of the elevator access.

The Department argues that the testimony of Ms. Gibson and Mr. Darien provided further evidence which demonstrated that the six point letter was a forgery. This evidence included testimony as to the process they followed in reviewing the Respondent's file, checking with the OEO, the lack of standard language and the worded "amended" in the six point letter. and that the person receiving the accommodation would have received a letter signed in ink – not a rubber

stamp.

The Department maintains that the Respondent felt entitled and thus forged the six point letter, using the three point letter as a template. She contradicted herself in testifying as to the difficulties with her classroom and getting to the union office. The Department insists she is incapable of telling the truth.

As to the allegations of verbal abuse contained in the first set of specifications, it is undisputed that Student A was absent the week of February 29, 2016. Common sense dictates that when the Respondent asked the class where Student A was on March 4, she became incensed when students told her that Student A was on vacation, and ridiculed the student, using the term "bat shit crazy."

The Department contends that Student A was candid and consistent in her testimony. She admitted that she did not like the Respondent and that the grade she ended up with was fair. Her testimony was consistent with that of her mother, with what she told Principal Scarmato, with what she wrote in her statement, and with what she told the OSI investigator. The manner in which she was contacted is meaningless - the fact is that she was contacted by a friend and told what the Respondent said in the classroom. Student A understandably told her mother, who sent the Respondent an e-mail. Investigator Blake, through her interview with Student B, corroborated what Student A told her: that Student B contacted Student A to inform her of the Respondent's comment. The investigator interviewed Student C over the phone, who corroborated that the Respondent had made the comment.

The Respondent used the phrase once again when Student A was in class. Student A testified that she took it as a dig at her. Student A's mother complained to the principal on March 18 2016, via telephone and e-mail. The principal, as a mandated reporter, reported the verbal

abuse complaint to OORS. The principal removed himself from the investigation, candidly testifying that his relationship with the Respondent was not an amicable one. OSI substantiated the allegations of verbal abuse. The Department submits that no one targeted the Respondent. She placed herself on the radar by using inappropriate language in class.

The Department points to the testimony of Erica, another student in the class. She was not a friend of Student A and was sincere in her testimony. The Department points out that both students noted how stressful the Respondent made them feel The Department argues that the evidence shows that the Respondent was well aware of the prohibition of verbal abuse. The witnesses who testified were indignant by the Respondent's violation of this prohibition. The Respondent herself admitted that she found the term offensive, and that she used it with colleagues, but never in front of students.

The Department maintains that the OSI investigation was fair, just and impartial but noted that this is a *de novo* proceeding where the arbitrator can consider the testimony and demeanor of the witnesses.

As to Specification Three in the first set of specifications, the Department submits that the testimony of Mr. Capa shows how students in the class reacted when an individual they did not recognize took pictures of them. They seemed nervous or startled. Ms. Tierno, the teacher for whom Mr. Capa covered also testified as to the students' reaction, as did Principal Scarmato. The concern was also reflected in the students' written statements.

The Department further argues that the Respondent's e-mail concerning the incident and the video of her gesturing to the custodian demonstrate that she knew she was doing something she should not have been doing.

The Department maintains that it has proven Specification Three by the testimony of

Capa, Tierno and Principal Scarmato, who exercised his prerogative to conduct the investigation based on the evidence he had, which included Mr. Capa's statement, a text, the student statements, the video tape and the still photographs.

The Department argues that the Respondent's assertion that she would have answered questions at the disciplinary meeting if she had been asked defies logic. The Respondent, as chapter leader, knows the drill. She had so many versions of what happened on February 10, 2017, she could not keep them straight. She changed her story multiple times during the disciplinary meeting. Four months later, she concocted the story that she was taking a picture of a fire extinguisher. If the fire extinguisher had been a pressing issue, the Respondent would have told the principal at the disciplinary meeting or the safety meeting. She did not know it was no longer a safety issue until a week or two after the safety meeting. She neither presented the principal with a copy of the photograph, nor wrote a rebuttal letter.

In sum, the Respondent has altered or forged an official document – a serious offense. The fact that she had worked for the Department for twenty-two years and has no priors is not a mitigating factor. Her egregious actions and behavior have severed the bonds between employee and employer. She can no longer be trusted and is not a role model for students. In light of the overwhelming testimony, she must be dismissed.

The Department submits a number of cases in support of its position: DOE v. Kathleen Sang, SED No. 8377, *aff'd sub nom* Sang v. NYCDOE, 30 Misc. 3d 1208(A), 2010, DOE v. M.P., SED No. 22352, DOE v. D.R., SED No. 5651, DOE v. A.W., SED No. 4642, DOE v G.A., SED No. 10271, all of which deal with various types of falsification of documents. The Department also cites DOE v. P.W., SED No. 25120, concerning verbal abuse. The Department submits that while the respondents in these cases had no prior disciplinary charges, the fact that

they committed serious, egregious offenses which crossed the line merited not progressive discipline, but termination.

The Respondent argues that in order to find her guilty of the conduct alleged, I must ignore that the principal admits a dislike for the union for which she serves as a chapter leader, and that it is inappropriate for him to conduct investigations into the chapter leader, even though he did so and that he drew conclusions which he could not prove. The Respondent further argues that the other investigations were not the full and fair ones which due process requires. The Respondent maintains that the students who made accusations against her had reason to lie. As to the allegations concerning the accommodation letter written in 2007, the Department failed to produce the author of the letter. The witnesses could not testify as to the creation of the document, only what appeared in their files in 2016 and 2017. The Respondent's accommodations only became an issue after she became chapter leader. The charges are based on hearsay, conjecture and assumptions with no direct evidence. The Department has failed to offer the required proof and the Respondent should be exonerated.

The Respondent has worked for the Department for twenty-two years, the majority of which was at Tottenville High School, her alma mater. There is nothing in the record to suggest she ever faced any disciplinary charges prior the December, 2016 disciplinary meeting. She was an active chapter leader, and she drew the ire of management. The principal testified as to a schism at the school which he felt entirely attributable to the Respondent and the union. This strongly suggests that management is not above board. The Respondent asks that the principal's undeniable enmity for the union and its representative be kept in mind.

As to the specifications where the Respondent is alleged to have used the phrase "bat shit crazy," the Respondent points out that a friend of Student A supposedly called or texted her

13

when she was on vacation. Student A immediately told her mother who in turn e-mailed the Respondent. However, neither Student A nor her mother took action until March 18, 2016 when Student A's mother sent an e-mail to the principal. The OSI investigator waited one month after she was assigned the case on April 20th to speak to Student A, and then did not speak to anyone else for another four and a half months. - She spoke with the Respondent six months after she received the case and eight months after the date of the alleged incident. The Respondent highlights that the Department never produced the text messages mentioned in the investigator's report. It is more likely that no text exists, or it does not match Student A's description of the text. During the testimony of both Student A and her mother, Student A received not a text but a phone call. There is nothing to explain this change in scenario other than Student A was not being truthful. The Respondent further points out that the Department was unable to produce the alleged e-mail to the Respondent via Pupil Path. Insofar as the Respondent testified that she never received an e-mail, it seems far more likely that it does not exist and the first e-mail was sent on March 18. This e-mail was sent a full ten minutes after the principal entered the OORS complaint despite his testimony that it was the e-mail which prompted him to submit the report. This is further evidence of the principal's lack of credibility.

Further to the investigation, the investigator took no action to speak to other students, claiming that the principal told her it was prom season, a statement which the principal denied making. The investigator was clearly lying. The report further indicates that the investigator did nothing more until September 12, six months after the incident and four months after she received the case. This was not best practice. Student B was obviously an important witness, but the attempt to interview her was delayed by more than half a year. She was not spoken to until 215 days after the date of the alleged incident. This is more than enough time for

memories to fade and to concoct a story. The investigator never asked her for the text. The other student the investigator spoke to was already known to her from an investigation of another allegation against the Respondent. The investigator testified that best practice is to speak to a third of the class, but she fell far short of this standard. The investigation fell shockingly short of even the minimum standard of acceptability, and should be given no weight.

The Respondent asserts that the testimony of Erica had some serious problems. She recalled Student A's specific absence, but could not recall anyone else's absence during her senior year, even though Erica claimed that Student A was not a friend. Erica never reported the statements even though she claimed that they made her feel stressed out. The first time she discussed the comment was when the Department contacted her to testify in this proceeding. The student latched on to the phrase as a way to get back at the teacher for her poor grades.

The Respondent vehemently denied using the phrase towards students in general or toward Student A in particular. The Respondent also maintains that Student A failed the marking period ending on March 18. She was clearly attempting to shift the blame for her bad grades onto the Respondent, whom Student A admitted that she did not like.

Finally, the Department indicated that another student informed Department personnel that she had never heard the Respondent say "bat shit crazy." Given this, the problems with the investigation and the lack of unbiased testimony, there is insufficient evidence to sustain Specification One.

Specification Two is similar in that it alleges that the Respondent used the phrase "bat shit crazy" generally. The Respondent argues that this allegation does not rise to the level of misconduct. General use of this phrase does not rise to verbal abuse, especially in light of the fact that the students were high school seniors, seventeen to eighteen years old. Moreover, there

is insufficient evidence to conclude that the Respondent used the phrase. The same students who testified as to Specification One testified as to this specification. The same biases and reasons to fabricate apply. Further, Erica's testimony waffled between saying what was alleged in the specification and saying "if you haven't started this project yet, you're screwed." Her testimony was not clear.

The Respondent denied saying the phrase in front of students so a determination must be made if Student A's testimony alone is sufficient to sustain the charge. Given all the issues that exist surrounding Student A, there is simply no justifiable way to credit her testimony. The words of a single student are not enough. In support of the Respondent's argument, she cites Matter of M.C., SED No. 26099, wherein the hearing officer dismissed charges of verbal abuse in light of the problems in the student testimony and clear motive to fabricate.

As to the Third Specification on the first set of charges, the Respondent asserts that the charges as written do not line up with the testimony. The charge was that the Respondent pointed a cell phone at students, while most of the witnesses testified about their belief that she had taken photos of students. All the witnesses admitted that they could not say for sure if the Respondent had taken a photograph. The principal's disciplinary letter admitted that he had no way of knowing if she had actually taken a photograph. Instead, the letter notes that the students believed that they were photographed. However, neither Chancellor's Regulation A-640, nor A-820 would be violated by students believing that they had their photographs taken. These regulations exist to protect the privacy rights of students. They do not address and were not promulgated to protect students against believing they had their photographs taken. The Respondent cites Matter of N.S., SED No. 29098, wherein the hearing officer dismissed charges because A-640 was inapplicable because it referred to commercial filming and photography and

16

it was a case, like this one, where the Department could not establish that filming was done.

Moreover, while there may have been video footage of the Respondent taking photographs, there is no prohibition against taking photographs in school. Respondent testified as to the photographs she took and the reasons why she took them. The footage cannot disprove her testimony. Mr. Capa, the only person who testified that was actually in the area that day cannot rebut her testimony. The Department cannot counter the Respondent's testimony that she took photographs of an office door and a fire extinguisher - actions that do not constitute misconduct.

As to the students' alleged discomfort in having their photographs taken, this does not constitute misconduct. Further, no students testified. The statements are hearsay, and it is firmly established that Education Law 3020-a allegations cannot be sustained on hearsay alone.

The Respondent argues that Principal Scarmato performed this investigation himself, instead of referring it to OSI because at this point he had become so angered by the Respondent's work as chapter leader that he wanted to set her up on disciplinary charges by any means necessary.

As to the second set of charges alleging impropriety in an accommodation letter submitted by the Respondent, she contends that the only letter she ever received was the one with six accommodations on it. She never saw a copy of a letter with three points on it until she requested her medical file in 2017.

The parties agree that the Respondent suffered an injury in 2002, and as a result eventually needed to request a medical accommodation. When an informal agreement could not be reached, the Respondent submitted an official request. In the late summer of 2007, there were negotiations which involved the Respondent, Gwen Roth of the Medical Division, and John

Tuminaro. After the Respondent was informed by Ms. Roth that she would be assigned to two classrooms, the Respondent became angry and threatened litigation. About six days later, an accommodation letter was sent by Yvonne Joseph of the Medical Division. The Respondent points out that Ms. Joseph did not testify and the two people who did testify did not become involved with her case until 2016. There is nothing in the record to indicate that Ms. Joseph is deceased or incapacitated, or that the Department undertook any effort to reach her. All we heard about was what was in a file in 2016 or 2017 – nothing about what happened in 2007. Because we did not hear from the sender of the letter, we have to put significant weight on what its recipient - the Respondent – told us. The employees from the Medical Division and the OEO testified as to documents they reviewed, but cannot tell us reliably what was sent to the Respondent in 2007. The only two people who can do that are the Respondent and Ms. Joseph, and the Respondent's testimony in this regard was unrebutted. While all the people who testified might provide guidance, when it comes to what the Respondent received, it is highly circumstantial, and not enough to outweigh the testimony of the Respondent.

The Respondent maintains that all four of the specifications require the existence of a forged document, and since there is insufficient evidence that the six point letter is forged, all of the charges must be dismissed.

The first specification alleges that on or about September, 2007, the Respondent submitted a forged document with the intent to defraud the Department by obtaining certain accommodations. Insofar as the statute of limitations in Education Law 3020-a is three years, the charge is untimely and must be dismissed. Because the language of the specification does not track the language of the Penal Code, the Department cannot rely on the Education Law's exception to the three year statute of limitation for conduct that constitutes a crime. Moreover,

the Respondent never testified that she gave the letter to anyone in 2007. Nowhere in Principal Tuminaro's testimony did he claim that he received a letter from the Respondent. With no evidence, documentary or testimonial, that the Respondent submitted the six point letter in 2007, this charge must be dismissed.

Specification Two must be dismissed for the same reason. It is predicated on a conclusion that a submission by the Respondent was made. The Respondent also asserts that the specification alleges that the Respondent received accommodations to which she was not entitled, including a secure locked cabinet. However, even the three point letter provides that she is entitled to this accommodation.

The Respondent maintains that it is likely that Principal Tuminaro received the same six point letter that the Respondent did. The evidence, according to the Respondent, shows that almost immediately after the letter was issued, the Respondent received the three "non-challenged" accommodations. In addition, the Respondent's testimony indicates that there was compliance with the other three. She was the only teacher assigned to her new classroom, C-212. Arrangements were made for delivery of proctoring materials. Principal Tuminaro told her not to pass in the hall and due to the nature of the assignment, she did not have to do any passing during the years between 2007 and Principal Scarmato's arrival. The fact that Principal Tuminaro could not recall these things happening does not mean he denied they did. Moreover, he acknowledged that her schedule meant she would not have to pass in the hallway. He stated that the delivery of proctoring materials would have been handled by his AP of testing. As to the accommodation of not sharing a classroom she was allowed to stay behind to do work. This accommodation that changed during the reign of Principal Scarmato.

The Respondent submits that her narrative as to Specification Three is simple, clear and

makes sense. By contrast, the Department will not be able to realistically argue that there is rock solid proof that the Respondent never received the six point letter, and therefore, must have created it herself. The only Department witness who testified as to what occurred in 2007 was Principal Tuminaro, and while he did not recall seeing the six point letter, that is different from affirmatively saying he never saw it. It is certainly possible that the passage of time affected his memory. Further, there was no accommodation letter on file in the principal's office. Had the three-point letter actually been received and placed in the file, it would have potentially resolved the issue, but it was not, meaning that it is certainly possible that the six point letter was the one that was sent. Further, given that more than just three accommodations were given to the Respondent it is more likely that the six point letter was sent to Principal Tuminaro.

Further, the fact that the Medical Division and the OEO had copies of the three point letter only proves what was in their files in 2016, not what happened in 2007.

The Respondent submits that the likely scenario was that the Medical Division drafted a three point letter, but later in response to the Respondent's angry phone call threatening litigation, it then drafted a six point letter. Due to human error, the three point draft was put in the Respondent's file and sent to OEO, while the six point letter was sent to the Principal and the Respondent. The failure to include the word "amended" can be explained by either human error, or due to the fact that the six point letter was, indeed, the only letter. The failure to include language concerning re-examination as evidence of doctoring of the letter is just speculation. Further, the Respondent testified that her condition was chronic. The Respondent submits that since both the three point letter and the six point letter have been copied multiple times, they are not clear enough to draw any opinion as to similarities or differences.

Finally, over thirty teachers at Tottenville had classrooms to themselves, belying the

assertion that such an accommodation cannot be made. The accommodation is not as burdensome as claimed, and thus is not evidence of fraud.

Specification Four is identical to Specification Three except that it cites submission of the letter to the Medical Division. The Respondent argues that the two witnesses from the Medical Division, Gibson and Darien, did not indicate that hat Respondent sent the accommodation letter to them directly. The only reference to an October submission was in the testimony of Joseph Zaza, but he does not work for the Medical Division. Further, as with Specification Three, there is insufficient evidence to conclude that the six point letter was a product of falsification. The Respondent submits that the facts in the last specification are similar to those in Matter of M.F., SED No. 24,858, wherein the hearing officer noted that the Department bears the burden of proving the charges. The only thing that has been shown is that the version of the letter the Respondent received in 2007 did not appear in two files in 2016.

The Respondent, while adamant that the Department has not proven the charges, submits, in the interest of providing a complete defense, several cases wherein the hearing officer declined to terminate the Respondent even in the face of the finding of a falsification of a document. Matter of E.R., SED No. 31346, Matter of P.H, SED No. 5407, Matter of A.B.,SED No. 8114, Matter of B.S., SED No. 5489. The Respondent also that I consider her long record of unblemished service, and the animosity shown the Respondent by the administration for her union activity.

## Factual Background

The Respondent testified that she has worked for the Department since 1995, having started at Tottenville, her alma mater. She was excessed from the school the following year, and

moved to the High School for Telecommunications, Arts and Technology. In 2004, she returned to Tottenville, where she teaches English. T. 887-899. She has no prior disciplinary charges. T. 1104. She became the United Federation of Teachers (UFT) chapter leader on June 2, 2015. T. 901. In her role, she is responsible for attending various meetings on behalf of the union, communicating with members, and ensuring that members' contractual rights are not violated. As chapter leader, she will file and help represent members in grievances. Chapter leaders may file grievances on behalf of individual members or the entire staff of the school, as may be the case when multiple people may be impacted. T. 893-900.

During the 2015-2016 school year, the Respondent filed eight grievances, one which was resolved and three which went to arbitration. The Respondent testified as to two grievances which resulted in arbitration decisions, both of which were sustained. The Respondent was told by the UFT to share the decisions with the members. T. 901-914. Respondent Exhibits 3, 4.

The Respondent testified that she had filed approximately seven grievances during the 2016-2017 school year. T. 913. On cross examination however, the Respondent admitted that she had sworn to a document wherein stated she had filed over twenty-six grievances. T. 1113. She described her attempts to discuss issues with the principal as consistently met with challenge. T. 916. She and a UFT representative had a meeting with the superintendents in December of 2015 concerning a breakdown in communication. T. 918. She stated their relationship deteriorated quite rapidly. She believed the schism of which the principal spoke was created by him. T. 925. The Respondent described her relationship with the principal during the 2016-2017 school year as "volatile." T. 961-962. She admitted that she did not respect Principal Scarmato's abilities as an administrator. T. 1108. She did not feel he was a fair administrator. T. 1116.

Donna Coppola a UFT Special Representative with District Representative responsibilities, testified that at the end of the 2015-2016 school year two of the grievances brought by the Respondent were advanced to arbitration. T. 862. Both related to compensatory time positions for which a school based option vote was not taken. The arbitrator ruled in favor of the union in both cases. T. 863. The UFT advised the Respondent to notify the members of the decisions. T. 864. When Principal Scarmato learned that the Respondent had notified the members of the decisions, he contacted the Department's Office of Labor Relations. The witness understood that the Department called to the UFT to have the e-mails retracted. T. 866. The witness described her interaction with the school administration as "painful." T. 866.

Principal Scarmato testified that his relationship with the Respondent, as chapter leader, was "professional," but later stated that it was adversarial and resistant. T. 281, 302.

The Department offered certain Chancellor's Regulations which it felt pertinent in this proceeding. The relevant portions read as follows:

Chancellor's Regulation A-421 –Verbal Abuse.

I.  A. It is the policy of the Department of Education to prohibit verbal abuse of students by DOE staff members…
    B. Disruptive behavior by a student must never be punished by use of verbal abuse.

II. A. Verbal abuse is defined as language (written or oral) about or directed toward students that:
    1. belittles, embarrasses or subjects students to ridicule; or
    2. has or would have the effect of unreasonably and substantially interfering with a student's educational performance or ability to participate in or benefit from an educational program, school-sponsored activity or any other aspect of a student's education; or
    3. has or would have the effect of unreasonably and substantially interfering with a student's mental, emotional, or physical well-being; or
    4. reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety; or
    5. reasonably causes or would reasonably be expected to cause

physical injury or emotional harm to a student.
(DOE 3)

Chancellor's Regulation A-640 – Filming at School Facilities

## ABSTRACT

All requests from producers of films, television shows, commercials, news magazine programs, or documentary news to film, photograph, or otherwise record images or voices in schools, on school playgrounds, or other New York City Department of Education ("Department ") property must be referred to the Office of Communication and Media Relations.   The Office of Communications and Media Relations is the only office with authority to grant or deny such requests.

**I. PROCEDURES FOR CONSIDERATION OF REQUESTS TO FILM OR PHOTOGRAPH AT SCHOOL FACILITIES OTHER THAN THE PRESS**

D. Student instruction shall not be impeded by any filming or photographing in school facilities.  Every effort must be made to limit filming or photographing to days and hours when classes and testing period are not in session…

E. Filming or photographing in school facilities during school hours will be permitted only with the written approval of the principal.

I. No Department employees or students may be filmed or photographed except with the express written permission of the principal and in addition, the respective Department employee or the student's parent or guardian.(DOE 4)

The Department also offered Chancellor's Regulation A-820 – Student Records; Records

Retention (DOE 5) and Chancellor's Regulation A-412 – Security in Schools (DOE 6).

**The Specifications concerning alleged verbal abuse and photographing of students and staff.**

Specifications One and Two – allegations concerning use of inappropriate language in the classroom

These specifications allege that the Respondent used the term  "bat shit crazy" in

reference to Student A (Specification One) and subsequently to the class generally (Specification

after the Respondent was interviewed by OSI. All told, these elements, along with the delays in conducting the investigation and issuing the report, bespeak to an investigation which fell short of the full and fair investigation which due process demands.

Thus, while I decline to afford any weight to the report, this finding does not mandate dismissal of the specifications. It is well established that hearings pursuant to Education Law 3020-a are *de novo* proceedings wherein the hearing officer renders a decision based upon the evidence adduced at the hearing.

In reviewing the evidence presented at the hearing, the question is, as with all charges brought under Education Law 3020-a, whether the Department has presented sufficient evidence to show that it is more likely than not that the actions as alleged occurred. In this specification, the only evidence we have as to what occurred in the classroom on or about March 4, 2016 was the testimony of Erica. I found Erica to be a thoughtful, credible witness. Her testimony that the Respondent used the term "bat shit crazy" in reference to Student A's absence was corroborated by the testimony of Student A and her mother. Student A testified credibly that she was contacted while on vacation with her family by her friend. Student A was sufficiently upset by the remark that she immediately told her mother.

I also found Student A's mother to be a credible witness. Specifically, I find nothing that would have prompted her to contact Principal Scarmato on March 18, 2016 apart from concern for her daughter. Of particular note in the e-mail was Student A's mother's reference to sending the Respondent a message via Pupil Path at "1428 hours on March 4, 2016." DOE 8. While this message was never produced, the witness's noting a specific time of the communication to the Respondent lends credence to her testimony that she reached out to the Respondent as a result of

33

her daughter informing her that the Respondent had used words in class to the effect that Student A was "bat shit crazy."

I also find that the Respondent's use of the term "bat shit crazy" in reference to Student A to constitute a violation of Chancellor Regulation A-421, which plainly prohibits use by pedagogues of language which "belittles, embarrasses or subjects students to ridicule." DOE 3. The Respondent was well aware of the prohibition. DOE 11, DOE 13, DOE 14. Even though Student A was not in class when the words were uttered, her fellow students quickly alerted her to the comment, which was sufficiently disturbing to Student A that two weeks later, she wrote that the Respondent had humiliated her in front of her peers. DOE 9.

Specification One contains six separate subspecifications, all of which contain the term "bat shit crazy" in some context. The evidence adduced at trial indicates that the Respondent uttered the phrase after being informed that Student A was on vacation. Both Erica's testimony and Student A's statement indicate that the Respondent said that Student A was bat shit crazy for going on vacation. They diverge slightly in that Erica testified that the Respondent added the clause "when school was going on," and Student A's statement stated added the clause "without telling her." Despite this difference, the statements were consistent that the Respondent said that Student A was bat shit crazy for going on vacation. Thus, Specification One (c) is sustained. Specifications One (a), (b) and (e) are dismissed as essentially duplicative of Specification One (c), and are thus dismissed. There is insufficient evidence to demonstrate that the Respondent made the specific statements set forth in Specifications One (d) and (f), and they are dismissed.

As to the second specification, I credit Student A's testimony that the Respondent made the statement that if students had not yet begun their index card project, they were "bat shit

crazy." As previously noted, I found Student A to be a credible witness. The Respondent argued that Student A and her classmates suffered from "senioritis" and were retaliating against the Respondent because she held them responsible and accountable. Respondent Exhibit 5. While Student A may have received poor grades from the Respondent, there is no indication that she harbored such animosity as to concoct a story she relayed to her mother while on vacation, and then testify concerning it two years later. Her testimony was corroborated by her own contemporaneous statement, as well as the testimony of her classmate.

I do not, however, find this statement to be verbal abuse. It is, instead, an inappropriate comment which is unbecoming to the Respondent's position. While I am aware that seventeen and eighteen year olds, as young adults, are undoubtedly familiar with the phrase and that it may be appropriate to have more mature conversations with students of that age, I cannot agree that students' age and sophistication is a license to use vulgar, inappropriate language in a classroom. Specification Two of the first set of specifications is sustained.

Specification Three – allegations concerning the taking of photographs in school.

The alleged actions of the Respondent which formed the basis of these charges came to the attention of the administration when Rosalia Tierno, a teacher at the school who also held the position of Coordinator of Student Activities (COSA) received a text message from a friend and co-worker, Lisa Johnson. At the hearing, Ms. Tierno testified that on February 20, 2017, because she was occupied at a cabinet meeting, Kreshnik Capa covered her eighth period class. While she usually taught the class in room B015H, which was next to her COSA office in B015I, because there was a substitute that day, the class was held in B015G. T. 723-724, 729.

Ms. Tierno explained that upon reading the text, she became very upset. T. 730. The principal noticed this and came up to her at ask her what was wrong, whereupon she showed him the text. It read as follows:

> ___ just told me he covered your class and Jessica Peterson came by and took pictures

> Ok

> Hey __ I was covering tiernos class and ms Peterson walked to the door and took pictures of the class. Not sure what that was about but she left too fast for me to ask what she was doing. If you can, let ms t know I think she's up to something

DOE 33. T. 732, 736.

The following school day, Ms. Tierno testified that she met with the children and they were very "inquisitive" regarding why their picture was being taken. They appeared nervous, uncomfortable and very concerned that they or Mr. Capa were going to get into some kind of trouble. T. 737- 738. Ms. Tierno admitted that she never saw a photograph and could not say for sure that a photo actually was taken. T. 751.

Kreshnik Capa also testified. He averred that when he was in the classroom, the door was to his left, the window and students were to his right. The students were doing their assignments when they asked him who was taking pictures of them. When he went to the door, he saw someone from behind, but did not recognize the individual. Mr. Capa testified that he asked the custodian who told him words to the effect of "that's your union leader" or "that's your union representative." After that, Mr. Capa recognized the individual to be the Respondent. He noted that the door to the classroom was open at the time. T. 507-510. Mr. Capa stated that after he saw the Respondent walking away, he sent the text set forth above to his colleague Lisa Johnson, whom he knew to be Ms. Tierno's friend. T. 511, 518.

He noted that there were three to five students who seemed nervous or startled. T. 518. At the principal's request, he submitted a statement. His statement notes that the teacher took three pictures of the class. He wrote that he did not see the teacher but the kids said "she took pictures of us." T. 523, 539. DOE 19, page 9.

On cross examination, Mr. Capa admitted that he never saw the Respondent's face- only the back of her head. When asked what he thought the Respondent was up to, he replied that he was not sure, but he knew it was something because she was not there to take pictures of the kids. He figured it had to do with Ms. Tierno. T. 530. He admitted that though his students told him that the Respondent took pictures, he could not say whether any were actually taken. T. 536-537.

Principal Scarmato conducted the investigation. He testified that after Ms. Tierno showed him the text message, he went to the surveillance cameras to verify that it was the Respondent taking pictures during that period. He averred that the video showed the Respondent taking pictures of the COSA office and then one of the classrooms adjacent to the COSA office. T. 325. He, along with Mr. Bloom, took statements from the students, noting that the students were freshman and could not identify the teacher taking pictures. T. 332. He also requested that Mr. Capa write a statement. T. 332.

Student SA wrote that someone came in and took pictures of the class. Student GB wrote that he "heard the teacher and a student talking about a woman pass by and snap one or two photos of us in class without permission." Student SE wrote: "…when out of nowhere, this girl came out of nowhere and took 3 pictures of us out of nowhere. The sub asked me 'who was that?' and I told him 'I have no idea' Then he asked the janitor who that was, but he said 'he does not know, but she seemed nice and he thought she belonged in the room.'" JP wrote: "I

remember we were all just talking to each other and by the door we heard a camera noise from a cell phone. We all look at the door and teacher looks away and walks away from the door. Everyone including the teacher thought she took a picture of us. The teacher called another teacher in the room and asked him about her and he said she was just a random teacher." VC wrote "On 8 period Friday some lady walked up to the door and took a picture into the classroom. DOE 19, pp 12, 13, 14, 15, 16.

Principal Scarmato held a disciplinary meeting with the Respondent, who originally told him that it was "all lies." After he showed her the videotape of the surveillance footage, Respondent said she was texting, and taking pictures of a sign. T. 334-335. The principal also testified that the students were concerned because they did not know what was going on, and they thought they were in trouble. T. 342. He concluded that the Respondent took photographs without authorization. T. 343. DOE 19. On cross-examination, he agreed that the regulations pertained to actual photographs or actual videotaping, and he never saw the photographs which the Respondent was alleged to have taken. T. 371, 376. He stated that the custodian did not want to make a statement because he did not want to get involved, but he and AP Bloom spoke to him. T. 379. He recalled the Respondent stating that she was actually asking a picture of a sign in the room. She never mentioned that she was taking a picture of the fire extinguisher. T. 380.

Assistant Principal Pagliarulo testified that he and Assistant Principal William Reynolds were asked by the principal to take photographs in the cafeteria where the COSA office, Ms. Tierno's classroom and the classroom used by Mr. Capa during eighth period on February 10, 2017 were located. In October, 2017, he photographed AP Reynolds taking photographs in an attempt to reenact the Respondent taking pictures as depicted in the video. DOE 20 a-d. T. 636-646. Based upon his familiarity with the building, he opined that the Respondent was facing

classroom B015G. T. 647, 652. On cross examination, he admitted that he did not recall discussing Chancellor's Regulations A-640 or A-820 at the 2016-2017 orientation. He never saw a photograph taken by the Respondent. T. 656.

AP Pagliarulo's testimony was corroborated by AP Reynolds, He explained that he took DOE 20a and 20b, and AP Pagilarulo took DOE 20c and 20d. He stated that he used a still photo taken from the video surveillance footage to best calculate where the Respondent had been standing, using the floor tiles as a reference point. T. 790-793. He admitted that he never saw a photograph taken by the Respondent. T. 805.

Assistant Principal Clifford Bloom assisted the principal in the investigation. He testified that there are multiple cameras throughout the school, and that he viewed a video of the Respondent taking pictures of the COSA office, and observed her as she walked to another classroom, making a "shush" sign. T. 546. He was present when the custodian had a conversation with Principal Scarmato in which he told him that he saw the Respondent taking pictures. T. 562.

The video depicts the Respondent entering the cafeteria and pausing, turning to her right, lifting a cell phone to eye level and holding it horizontally. She then walks closer to the camera, turns toward her left and briefly places her index finger to her lips. She continues to walk several more paces, stops, turns to her right and again lifts the phone to eye level, holding it horizontally, then turns and exits the cafeteria. DOE 28.

AP Bloom also attended the disciplinary conference with the Respondent. His notes reflected that the Respondent said she did not need to read the statements taken because they were all lies. DOE 29, T. 564, 570. She originally said that she was texting in the video. T. 569. On cross examination, AP Bloom admitted that he never saw photos taken by the Respondent. T.

571. He reasserted that at the beginning of the disciplinary conference, the Respondent said she was not taking any pictures. T. 578. He did not recall the Respondent mentioning anything about a fire extinguisher. T. 579.

Several witnesses testified concerning photography in the schools. Ms. Tierno offered that to her understanding, according to Chancellor's Regulations, if a student is to be photographed, there is a photo release form that must be filled out by the parents. T. 720. As the COSA, she was responsible for distributing and explaining that form to any teacher that asks for it. DOE 37, T. 720-723. Principal Scarmato stated that unless students have given consent to be filmed or photographed, staff should not be going around taking pictures of students at any time without a purpose or at least an explanation. This is expressly set forth in a Chancellor's Regulations, and the consent form is disseminated all the time through the school year. DOE 18. T. 318-319. He asserted that a photograph is a student record. T. 398.

The Respondent testified that on February 10, 2017, she was walking around the building to take notes about items that should be brought up at the consultation meeting and the school safety meeting. This day, she thought she would kill two birds with one stone and also take pictures of the COSA office for her harassment log (a log she kept because she felt she was being targeted by the principal). T. 964-965, 969-970. She took a picture of the COSA office and toward the left side of the doorway, she saw a white sweatshirt hanging down. As she got closer, she realized that the white sweatshirt was hanging from the fire extinguisher. T. 974. She became concerned that this could be a fire hazard. She took a picture of the sweatshirt hanging from the fire extinguisher. T. 976.

The Respondent denied taking any photographs with students in them. She was taking pictures for what she believed was a potential safety issue that she was going to bring up at the

Two). The administration became aware of the allegation when the parent of Student A (Parent A) contacted Principal Scarmato.

At the hearing, Parent A testified that during the week of February 29, 2016, she was on vacation with her two daughters in Mexico. School was open during this time. Student A told her that one of her classmates had called her to tell her that the Respondent had made the remark in class referring to her and saying that "that girl must be bat shit crazy." T. 120, 129. Consequently, Parent A sent the Respondent a message on Pupil Path, telling her how dissatisfied she was with the language used in describing her daughter. She did not receive a reply. T. 124. On March 18, 2016, Parent A called and then e-mailed Principal Scarmato because she was very angry about her daughter being told by several students of the "bat shit crazy" comment as well as a subsequent incident. DOE 8, T. 122.

Principal Scarmato identified that e-mail, and testified that he called Parent A to get more details and address her concerns.[1] T. 287-289. He called Student A to his office, where he asked her to write a statement. She told him that her friends texted her that Respondent said that if she thought she could make up a project, she was "bat shit crazy." T. 290. Thereafter, Principal Scarmato submitted a complaint to the online reporting system. DOE 19. He included the additional allegation, contained in Student A's statement, that the Respondent had told the class that if they had not started an index card project they were "bat shit crazy." T. 293. DOE 9.

Principal Scarmato stated that verbal abuse is discussed every year on the first day back from vacation. T. 272-273. The Respondent was present at the first day orientation for the 2015-2016 school year. DOE 14, T. 275. AP Gregory Pagliarulo corroborated the principal's

---

[1] Principal Scarmato later modified his testimony to say that he received the e-mail from Parent A after he spoke to her, acknowledging that he submitted the OORS report before he received the e-mail. T. 362.

testimony, stating that he takes a major role in the first day staff meeting wherein Chancellor's Regulations, including A-421, are reviewed. T. 634-635.

Principal Scarmato confirmed that Student A was absent during the week of February 29, 2016. T. 287, 296. DOE 15. He further averred that he had no input into the investigation of the complaint, specifically asking OSI to conduct the investigation because at that point in time, his relationship with the Respondent was not amicable, and he did not want her to perceive that he was using his position to conduct the investigation. T. 302.

Student A testified that during the 2015-2016 school year, the Respondent was her senior English honors teacher. T. 134-135. She stated that during the week of February 29, 2016, she was on vacation in Mexico with her family. She did not tell the Respondent that she was going to be away while school was in session. T. 136. While on vacation, Student A received a phone call from a friend telling her that the Respondent had asked the class where Student A was. A classmate told the Respondent that Student A was on vacation. The friend then informed Student A that the Respondent said in front of the class that it was bat shit crazy that she decided to go on vacation while school was in session. T. 137-138.

Student A offered that she felt embarrassed, especially since she was not there to defend herself. It was demeaning and just made her feel bad about herself. T. 139.

Student A identified her statement wherein she stated that she was humiliated in front of her peers by the Respondent calling her "bat shit crazy." DOE 9. She further wrote in her statement that on March 17, 2016, the Respondent was discussing an index card project, and said to the class, "It is bat shit crazy if you did not begin this project yet." T. 141-142. Student A testified that she was present in the class when the Respondent made this statement, and felt that it was a dig at her. It made her uncomfortable to hear that phrase again. T. 143-144.

On cross examination, Student A testified that she did not reach out to any classmates when she was still on vacation, but eventually spoke to three other students. She admitted that March 17, 2016 was the first time she had heard the Respondent use the phrase "bat shit crazy." She also admitted that she did not like the Respondent very much. T. 154-155.

Erica Scotto Divetta, who was in Student A's senior English Honors class during the 2015-2016 school year, testified that she recalled that the Respondent had asked during the week of February 29, 2016 where Student A was. The witness testified that the Respondent stated that it was "bat shit crazy" for her (Student A) to leave when they still had school going on. T. 226-227. Ms. Divetta also explained that the students had an index card project that was part of their end of year senior paper. In March, the Respondent made a comment that "we had better have started. Otherwise we're like screwed and …we have no chance or a prayer of getting it done on time. T. 288. She characterized students who had not started their project as "bat shit crazy." T. 229. The statement was made in front of the class and directed at the entire class. T. 228-229. The witness testified that the comment started to stress her out. She started wondering if she had done the project correctly. T. 229. She further testified that the comment about Student A made her feel a little uncomfortable because she would not have liked to have been called that either. T. 230.

On cross examination, Ms. Divetta admitted that she did not discuss the Respondent's comments with her parents or friends. She also believed that counsel for the Department used the term first in their conversation. She admitted that she did not get her assignments in on time for Respondent's class, but believed her grade was justified. T. 234-236, 237. The witness noted that it was not uncommon for the Respondent to use that language, and she had told counsel it was

something the Respondent most likely said. She did not remember specifics, but for this incident, she believed the Respondent made the statement. T. 237-238.

Camille Blake, the OSI investigator testified that she was assigned the case, and went to school on May 18, 2016, where she spoke with Principal Scarmato and Student A. T. 187, 189. She also spoke with Student A's mother. T. 188. Investigator Blake averred that Student A told her that she was on vacation when she received a text message from a classmate that the teacher said she was bat shit crazy for going on vacation and not completing her work. T. 189. She testified that she also interviewed two students over the telephone. T. 190. She testified that the Respondent denied using the term in the classroom. T. 195. The investigator concluded that the case was substantiated in a report dated November 14, 2016. DOE 10.

On cross examination, it is noted that between May 18, 2016 and the end of the school year, the investigator did not interview anyone. She waited until October to speak with other students because she was told that most of the senior class was not in school the day she visited because it was prom season. After May 18, 2016, she was not able to go back to the school, so she conducted phone interviews. T. 200. She also admitted that Student A did not show her, and she did not see, the text message. T. 200. She determined whom to interview based upon what Student A told her in terms of who sent her the text message. She interviewed Student C because she knew that the student was in the class from another investigation. At no point did she see a roster of students. She did not randomly select students she interviewed. T. 202-203. She agreed it was generally best practice to speak to a third of the class, but she did not do that in this case. T. 203. She further testified that she did not recall Respondent asking to look at copies of written statements or asking her to interview additional students. T. 204. The investigator stated there was no need for students to write statements if she was interviewing them. T. 208.

The report contains interview notes of Students B and C, both of whom were interviewed by telephone on October 5, 2016, after they had graduated. The interview notes for Student B stated that "The teacher then stated that Student A was "bat shit crazy" for going on vacation. The teacher used that term multiple times, at least twice she was referring to Student A. This was said to the whole class about Student A...." The interview notes of Student C state that "Student A was the only one on absent (sic) because she was on vacation and the teacher stated that if anyone thought they were going to go on vacation and make up work then they were bat shit crazy." DOE 10, pages 16, 17. It is noted that investigator's interview with Student A states: "Student A, explained that, according to Student B, Ms. Peterson was talking about a class project and she stated that if a student had not started the project then they were "bat shit crazy." DOE 10, p. 2.

It is noted that Principal Scarmato did not recall telling the investigator that it would be difficult for her to speak with students because it was prom season. Prom was on June 11, 2016. T. 359-360. Seniors would have been in school every day or almost every day for at least part of the day in May and June. T. 359.

Principal Scarmato, based upon the OSI investigation, concluded that the term "bat shit crazy" was used in the classroom. T. 317. He agreed with the union's assertion that the investigation took longer than it should have, and concluded that the investigation was not held in a timely manner which was why he noted on the disciplinary letter that the document would not be placed in her file. T. 370. DOE 17. It is noted that the disciplinary letter, dated December 12, 2016 speaks only to the incident referenced in Specification One, although it incorrectly puts the date of the incident as March 18, 2016.

The Respondent called UFT Special Representative Donna Coppola, who testified that she represented the Respondent in connection with the OSI investigation, as well as the disciplinary meeting with Principal Scarmato. Ms. Coppola testified that the only document she was provided by the OSI investigator was the statement by Student A. T. 854. In response to Ms. Coppola's inquiry, Investigator Blake told her that there were no other statements. T. 853-855. Ms. Coppola testified that after she had the opportunity to review the OSI report she noted inconsistencies. The timeline in the report did not follow what happened at the OSI meeting. The investigator had not mentioned anything about telephone interviews with other students. She recalled that the meeting with the investigator was at the end of October, but the report stated that the investigator spoke to the students before their meeting. She told Principal Scarmato that she had to question the phone interviews because it was not typical to have a telephone conversation with an investigator. T. 857-859. She noted that the meeting with Principal Scarmato was cordial, but she made it a point to say that this was definitely a strange investigation. T. 861.

The Respondent testified that during the 2015-2016 school year, she taught sophomore and senior honors English classes. She stated that she had a policy that students could not make up work. However, in actuality, the teachers encourage students to make up work and get back on track. She stated that she was very lenient when it came to students missing work. T. 928.

The Respondent described Student A as a relatively introverted student. T. 932. She found out that Student A was on vacation in March from her guidance counselor. Student A did not tell her she was going to be on vacation. The Respondent explained various methods by which students and parents alert teachers of a planned absence. T. 933-934. The Respondent testified that she was concerned when she found out that Student A was on vacation because

30

during the fall semester, her grades had slipped heavily. T. 935. She had a discussion with Student A's former English teacher about giving Student A a chance to make up the work so she could get back on track. T. 935. She did not speak to the class about Student A's absence because she had already spoken to the guidance counselor. T. 936.

She found out about the allegation in October, 2016. She testified that after she was shown Student A's statement at the OSI interview, Ms. Coppola asked the investigator if she had anything else. Investigator Blake informed them that the statement was all she had. She did not interview anyone else. T. 940.

The Respondent told the investigator that she never in her life called or said that a child was "bat shit crazy." T. 942. She admitted using the phrase when discussing the current situation at the school with her colleagues, but did not recall ever using the phrase in front of students during the 2015-2016 school year. T. 943. No student or teacher ever complained directly to her concerning the language. T. 950.

She told Investigator Blake that Student A was retaliating against her because she was in the situation of missing work at the end of the marking period. She did not think Student A was being forthcoming with her parents. Having not made up any of the work, Student A failed the marking period that ended on March 18, 2016. T. 944-945.

The Respondent denied receiving an e-mail or a Pupil Path message from Parent A concerning the allegation. T. 946.

She characterized Erica as a bright and talented student who did not always keep on track of her work. She stated that Erica received an 88 the first semester, but by the end of the third semester she believed her marks were in the low 60s. T. 949.

She recalled the disciplinary meeting in December, 2016, where she and Ms. Coppola noticed witness statements that had not been there when they went to the OSI investigation. She noticed discrepancies in the timeline. T. 951. Ms. Coppola pointed out that the entire investigation was untimely. T. 953. The Respondent had memorialized what went on in the class that year in an e-mail to Ms. Coppola. Respondent Exhibit 5, T. 957-959. The Respondent admitted that she was present for AP Pagliarulo's presentations. T. 1174.

Opinion

As an initial matter, a determination must be made as to what, if any, weight should be given to the OSI report. The report is dated November 14, 2016, eight months after the alleged incident. Investigator Blake testified that she went to the school on May 18, 2016, when she interviewed Student A and Principal Scarmato. She testified that she could not interview additional students because it was prom season and seniors were not at school. This assertion was directly belied by the testimony of Principal Scarmato who stated that the prom was in June. The investigator was unable to credibly explain why she could not interview additional students in the class. Further, she failed to attempt to reach out to one-third of the students in the class, which she conceded to be best practice. Instead she contacted Student B and a student whom she knew from another investigation via telephone in October. She did not randomly select other students. Further, the investigator did not ask the witnesses if she could view the alleged text message which Student A received. She also confused the two separate incidents where the Respondent was alleged to have said "bat shit crazy."

Finally, there exists a question as to when the telephone interviews were taken. Ms. Coppola was clear that at the time the Respondent was interviewed by OSI, no student interviews had taken place. They were either not offered to the Respondent to review, or they were taken

following safety meeting. T. 989. She stated that when she was out of the video frame, she was inspecting the sweatshirt on the fire extinguisher. T. 987, DOE 19, p 6.

Later that day, the Respondent received an e-mail requesting a meeting with the administration and her union representative. T. 990. At the meeting, she was accused of professional misconduct by entering a classroom and taking pictures of children. She denied the allegation. T. 992. Since she had no reference point in terms of what the principal was talking about, she told them that she was texting, because she knew that prior to entering into the cafeteria, she had been texting for her safety and consultative logs. She testified that she was very insistent at the meeting that she had not entered a classroom. T. 992-993. At no point was she asked of what she had been taking photographs or why she was in the cafeteria. T. 994, 999. She implored them to speak with both the custodians because she knew that she had done nothing wrong. T. 995. She submitted an e-mail she had sent to the UFT outlining her concerns. She felt that as a chapter leader, she was being targeted and penalized. T. 998-999. Respondent Exhibit 7.

The Respondent testified that she spoke with the custodian, who told her that the administration approached him, but he did not write a statement because he did not feel comfortable doing so. She asked him about the fire extinguisher, and he told her that he put it there starting eighth period. By then, lunch was over, and it was not a safety issue. T. 1000.

On cross examination, the Respondent could not identify the letter issued by the UFT concerning permission to photograph students. T. 1176. She denied that she had the picture of the sweatshirt on her camera and she never printed it out. She stated that she might have seen students in the classroom, but her focus was not on them. T. 1178. She had her conversation with the custodian maybe a week or two after her meeting on February 14, 2017 with the

principal and AP Bloom. T. 1179. The date of the safety and consultative meetings was February 15, 2017. T. 1182, 1184. She never presented anything in the safety meeting about the sweatshirt, although there was still a safety concern. T. 1184.

The Respondent later testified that she did not print out the picture of the fire extinguisher because after her meeting with the principal and assistant principal, it was obvious to her that they did not care what she had to say. She further averred that there was no reason to take pictures of children. T. 1216.

Opinion

This set of charges contains three very specific allegations: that the Respondent pointed a cell phone at one or more students, that she caused them to believe that she was taking photos of them and that she caused them to feel uncomfortable and/or nervous.

In dealing first with the Specifications Three (b) and (c) concerning what the students believed and what they felt, I note that no students testified. Mr. Capa was in the classroom, and testified that the students questioned what was going on, but his testimony is insufficient to demonstrate what the children believed or felt. Any statements to him were hearsay, as were the statements the students made to Ms. Tierno the following Monday, and the written statements taken by Principal Scarmato. Of note is none of the students' written statements mention they were nervous or uncomfortable. It is well established, that hearsay, standing alone, is insufficient to sustain a charge under Education Law Section 3020-a. In a case such as this wherein the allegations turn upon the beliefs and feelings of the students, the Respondent should be afforded the ability to test the veracity of the students' statements on cross-examination, and the extent to which, if at all, the statements were made in response to suggestion by adults. Apart from the question as to whether causing students to believe that their photograph was being taken

42

constitutes misconduct, there is simply insufficient evidence to show that the Respondent caused the students to believe she was taking pictures of them or caused them to feel uncomfortable and/or nervous. Specifications Three (b) and Three (c) are dismissed.

As to Specification Three (a), the Department submitted a number of previously noted Chancellor's Regulations concerning the filming or photographing of students at school.[2] Witnesses testified as to the need to seek parental permission before photographing students. As the hearing officer in <u>Matter of N.S.</u> SED No. 29098 noted, Chancellor's Regulation A-640 emphasizes that outside entities may not film students for the entities' benefit without permission. He noted that in the Abstract section of the regulation, the reference is to "requests from producers of films, television shows, commercials, new magazine programs, or documentary news to film, photograph, or otherwise record images or voices" in schools, on school playgrounds, or other Department property. As in this case, there was no allegation that the respondent took photographs for commercial purposes. Further, while Chancellor's Regulation A-820 speaks to confidentiality and release of student records, and that photographs and yearbooks are an "education record" under the regulation, an education record is defined as one which is directly related to a student and maintained by the Department of Education. Any photographs taken by the Respondent would not fall under this definition. Finally, this specification does not allege that the Respondent took a photograph of the students in the classroom that day. It alleges that she pointed a cell phone at one or more students.

The Department has alleged that the Respondent has engaged in unprofessional conduct. While the issue might have been resolved earlier had a photograph of the sweatshirt been produced, none was. The question is whether the Department proved that the Respondent pointed a cell phone at one or more students, and if so, whether that action constituted misconduct.

The principal acknowledged that he had no way of knowing whether the Respondent actually took a photograph. The only witness who may have seen the Respondent in the cafeteria taking pictures, the custodian, did not testify. I have carefully reviewed the video footage, as well as the photographs submitted by the Department wherein it attempts to recreate photographs taken by the Respondent. A comparison of Department Exhibit 20a and Respondent Exhibit 6 demonstrates that, while the Department's attempt to determine whether the Respondent took photographs of students was understandable, the re-creation was not necessarily accurate. Respondent Exhibit 6 the photograph of the COSA office appears to have been taken at an angle different from the one taken by the administration. This suggests that the photograph taken by the administration of Ms. Tierno's classroom may not have been an accurate depiction of the photograph taken by the Respondent. Further, insofar as the interior of the classroom depicted in DOE 20b is dimly lit, with some student desks facing away from the door, it is impossible to assess whether the Respondent was pointing the cell phone at students specifically, or just the entrance of the door and the fire extinguisher generally.

There may be instances wherein the pointing of a cell phone at students could constitute misconduct. Given the circumstances of this case, apart from the lack of evidence to show that the Respondent pointed a cell phone at students, the Department has failed to demonstrate that the Respondent's actions constituted misconduct. It has not met its burden and the Specification Three (a) is dismissed.

**The Specifications concerning alleged forgery/falsification of the accommodation letter.**

The facts which formed the basis for these specifications were investigated by the Special Commissioner of Investigation. According to Investigator Robert Laino, SCI received an e-mail from Ms. Susan Dombrow, the Associate Director of the Department's Office of Equal

---

[2] I find CR A-412, Security in the Schools , (DOE 6) to be inapplicable to the instant set of facts.

Opportunity (OEO). Ms. Dombrow included an e-mail she had received from Ms. Nnekh Udoh, Esq., who at the time served as the Disability Coordinator for the Office. Ms. Udoh notified Ms. Dombrow that the Respondent had initiated an OEO complaint against the principal regarding an accommodation, and Ms. Udoh noted that the accommodation letter given to her by the Respondent was different from the one contained in the OEO file. Ms. Udoh advised that Glenn Darien from the Medical Bureau had called her looking for a copy of the accommodation letter. When he had looked in the Medical Bureau's file, there was one letter which noted three accommodations. T. 84-85. Mr. Laino testified that he interviewed Ms. Udoh who told him that there were issues as to font and the signatures on the two letters were identical. She thought one may have been doctored. T. 79-81.

Investigator Laino testified that he interviewed Principal Scarmato who advised him that the Respondent had given him a letter with six accommodations. The letter came to Principal Scarmato's attention when the Respondent, on about August 22, 2016, e-mailed AP Reynolds, who oversaw programming, to inform him of an accommodation she had regarding room assignment. She stated that she was supposed to be in a room by herself. The accommodation letter she provided as an attachment to the e-mail had six bullet points. T. 345, 779. They were:

- The same classroom for your teaching assignments
- Not to share a classroom with other teacher
- Secured locked cabinets to avoid carrying teaching/testing materials and or supplies
- Delivery of all required proctoring materials for exams
- To avoid hall passing
- Elevator access

Upon seeing the Respondent's request, Principal Scarmato reached out to William Brewton at the Office of Equal Opportunity to ask if an accommodation letter that was almost ten years old needed to be honored, and if no, what other procedures needed to be followed. T.

345. Mr. Brewton instructed him to direct the staff member to submit medical documentation to Ms. Lorraine Haynes at the Medical Division.

At the hearing, Ms. Udoh testified that she became the office's disability coordinator upon the retirement of Mr. Brewton. T. 422. She stated that in October, 2016, the Respondent reached out to the OEO to complain that her accommodations were not being honored by her supervisor. T. 424. On or about October 17, 2016, Mr. Darien e-mailed her concerning an issue as to the Respondent's accommodation. The Respondent had shown him one accommodation letter, but there was a different one in the Division's file. Mr. Darien indicated that he had an accommodation notice that had three points, indicating three different accommodations. Mr. Darien asked her to determine what accommodation notices the OEO had in its file. Ms. Udoh found in the OEO's file an accommodation notice with the same three points as that in the Medical Division's file. They were as follows:

- The same classroom for your teaching assignment
- A secure locked cabinet to avoid carrying teaching materials
- Elevator access

The accommodation notice which the OEO had in its file was date stamped September 24, 2007 at 11:00am. DOE 7, page 31, DOE 23, T. 424-427, 429. She had determined, along with Mr. Darien, that the Respondent may have fabricated her accommodation notice. As a result, she e-mailed her supervisor, Susan Dombrow on December 7, 2016. T. 430. Ms. Udoh testified that she observed that the OEO letter had three bulleted accommodations, whereas the one Respondent alleged she had received had six. She also noted that the font in words "elevator access" was different. She noted the difference in verbiage in the two letters. There was an omission of the standard language that the accommodation is subject to annual review. She also noted that the signature lines were essentially identical. T. 431-434. She admitted that she had no

firsthand knowledge of what was put in the Respondent's file in 2007. T. 435-436.

Glenn Darien testified that current employees are governed by Personnel Memorandum Number 10. This document outlines the process by which an individual can apply for and secure an accommodation. An employee may make the request informally of the supervisor. If the supervisor (usually the principal in the case of a school based employee) does not provide the accommodation, the employee can submit an accommodation request form to the Medical Division for medical review. The approval or denial ultimately rests with the Office of Equal Opportunity T. 448. In 2007 although he was not at the office, it was his understanding that the Medical Division would have made that determination. The change happened sometime between 2007 and 2010. T. 449-450. In 2007, an employee would have been informed by a notice (a letter) sent from the Medical Division detailing the specifics of the accommodation. The OEO, the employee's supervisor and the union would get a copy, and the Medical Division would keep a copy. T. 450-452. This testimony was corroborated by that of Mercuria Gibson. T. 1234-1235. The witness stated that in 2010, which was when he had firsthand knowledge of the Division's procedures, an amended notice would clearly be marked "amended" in bold lettering. T. 453. The same individuals and entities that were copied on the original notice would be copied on an amended notice. T. 455. All the documents and record of activities the occurred during an employee's tenure with the Department, including any notices and amended notices of accommodation would be contained in the employee's medical file. T. 454.

Mr. Darien testified that on September 8, 2016, he was asked by the Director to pull information concerning any accommodations in the Respondent's medical file. He found one accommodation letter with three points. T. 458-459. DOE 24, DOE 7, Page 32. He did not find a letter with six points in the file. T. 460 DOE 7, Page 33. He e-mailed Ms. Udoh, who responded

that the letter which the OEO had in its file also had three points. T. 461. Mr. Darien noted that the policy in 2010, which he believed to have been the same policy in 2007, was that there was standard language in the letters saying that the accommodation may be subject to annual review, although he agreed that not all accommodations were reviewed annually. T. 474,489. He admitted interacting with the Respondent via e-mail, but did not recall the specifics. T. 490. The witness also identified the Respondent's medical file which had been in the Division's possession. DOE 25, 26. T. 463-483.

SCI also interviewed Mercuria Gibson, who told Investigator Laino she could confirm the three accommodations, but not the six, and cited a number of things wrong with the document, including that if it had been amended, it would have said amended in it and that it would have said that it was subject to annual review. T. 88-89.

Ms. Gibson testified at the hearing that she has worked with the Medical Division for thirty-four years. In 2007, she was deputy to the manager, at the time, Yvonne Joseph. Ms. Joseph retired in 2009 or 2010, and no longer resides in New York City.

Ms. Gibson testified that in 2007, an employee would be advised of the Division's determination concerning the accommodation request in a letter outlining the accommodation that was approved. The original was sent to the employee. The employee's supervisor (typically the principal), the UFT and the OEO would be copied. A copy would be placed in the employee's file with the Medical Division. T. 813-814. She noted that the document would be hole-punched and securely fastened in the file folder. DOE 35. T. 817. 820.

Ms. Gibson testified that all documents that are amended in her office would have "amended" written on the top of them. T. 818. She stated that she found one accommodation letter with three points in the Respondent's file. T. 820, 822 DOE 30, page 3. She noted that

depending on the person's medical condition, there would be a notation on the letter that the accommodation may be subject to annual review. T. 822. She indicated that Ms. Joseph signed her letters by hand. There was no rubber stamp of her signature. T. 823, T. 1246. Letters were sent by regular mail only. T. 1239.

Ms. Gibson also recognized the e-mail she had sent to Mr. Zaza's secretary when he was inquiring as to the Respondent's accommodation. T. 827. DOE 30. She further explained that Gwen Roth, who corresponded with Principal Tuminaro in 2007 functioned as the administrative assistant to Yvonne Joseph. T. 1237.

On cross examination, the witness admitted that she had never been involved in the negotiation over the Respondent's accommodation. She only became aware of Ms. Peterson in the last eighteen months. T. 1242. She admitted that it is possible that not all documents make it into someone's file. T. 1243. She acknowledged that some medical conditions are not subject to annual review. She is not involved with the decision as to whether an accommodation is subject to annual review. T. 1245. She could not say for sure that the Respondent received the three point accommodation letter – only that it was the one in the file. T. 1248.

At the hearing, Principal Scarmato opined upon some of the Respondent's accommodations set forth in the six point letter. He stated that there is an impact to a teacher not sharing a classroom, insofar it may result in another teacher having to travel to multiple rooms. T. 353-354. He further stated that he had never seen anything like not having to carry supplies or delivery of proctoring materials. As to avoiding school passing, it is school policy and a DOE recommendation to have an adult presence in the hallway when students are passing to their next class. T. 354.

Principal Scarmato testified that he was not aware of the accommodations received by the

Respondent during the 2014-2015 school year, nor most of the 2015-2016 school year. The Respondent advised him of the accommodations sometime before the end of the 2015-2016 school year. T. 381-382. He was not shown an accommodation letter until August, 2016. T. 399. While he testified that he believed the only accommodation that was not overly burdensome to the school was elevator access, which all teachers have, he stated that his role was to support the decision of the Medical Division. T. 387, 399.

Investigator Laino testified that SCI found the allegation that the Respondent had submitted a false document to the principal and/or the Medical Division to be substantiated. T. 68, 92. The investigator admitted that he did not interview Ms. Joseph, Mr. Tuminaro, or anyone from the UFT. He was no longer in possession of his interview notes of the Respondent, and he never saw an original of an accommodation letter. T. 96-102. Based upon SCI's investigation, the Principal issued a disciplinary letter and sustained the charges. DOE 22.

Apart from those witnesses who had been interviewed by SCI, the Department called Joseph Zaza, who during the 2016-2017 school year, was Principal Leadership Facilitator, Deputy Superintendent of District 31. In this role, he would, among other duties, support and evaluate principals and sign off on line of duty injury (LODI) requests. T. 583-585. Mr. Zaza testified that he met the Respondent in her role as UFT Chapter Leader and to talk about her LODI request. T. 586.

In October of 2016, the Respondent provided him a copy of an accommodation letter. He noted that there were six bullet points in the letter. He called Tottenville High School and Principal Scarmato had the same letter. Mr. Zaza stated that he observed what he saw as an outlier- the accommodation that a classroom not be shared. He averred that he had never seen in an accommodation letter that the teacher may not share a room with another pedagogue. T.

592-593. He stated that in a school the size of Tottenville, it would be uncommon to accommodate that request because of the sheer size of the student population and the programmatic difficulties in leaving a room vacant half a day. He questioned why the Medical Division would have made, in his view, these unusual accommodations. As a result his secretary e-mailed the Medical Division to inquire. T. 593-594. DOE 30. He learned that the six point letter was not in the Medical Division's file, and consequently, called SCI. T. 599-600. He stated that he had reviewed quite a few accommodation letters in his role as a Principal Leadership Facilitator and he had never seen such an accommodation. He admitted that was not involved with programming at Tottenville. T. 601-612.

AP Reynolds explained that there are 212 teachers and 134 classrooms in Tottenville. In the 2015-2016 school year, the year he started at Tottenville, the classrooms had already been assigned. The following year, the assignments remained the same with some "tweaks" T. 784-785. AP Reynolds also testified as to the room grids, which laid out the room(s) in which teachers taught. The room grids, which noted the Respondent's classrooms, were offered as DOE 32. T. 787-788. The 2007-2008 school year room grid was not available to print. T. 789. AP Reynold noted that not sharing a room could make programming "a little difficult." Teachers may have to move or go to multiple rooms because a room is not allowed to be used to its fullest potential. T. 798-800. He stated that a majority of teachers share a classroom. T. 807.

John Tuminaro was the principal of Tottenville from 1999 until his retirement in September, 2013. In the course of his testimony, he identified a series of documents which were e-mails sent in 2007 concerning the Respondent's accommodation. He recalled assuring Ms. Roth that the school had already done its programming, but that the Respondent's accommodations would be taken care of, and he would have to make some changes in the

programming. T. 667-669. He noted that, as principal, he would be the person responsible for making sure that the accommodation is carried out. T. 665. He recalled the Medical Bureau had requested three items: that the Respondent have the same classroom, have a locked cabinet and elevator access. T. 670. These requests are set forth in a series of e-mail between Gwen Roth and Principal Tuminaro on September 6, 2007 and September 7, 2007. Ms. Roth e-mailed Principal Tuminaro on September 6, 2007 at 10:50 am and wrote the following:

"The Medical Office is planning to grant Jessica Peterson the accommodation of:

   *The same classroom for all teaching periods
   *No carrying books-a locked closet in assigned room
   *Elevator access

Please confirm that you will arrange to provide this accommodation, or contact us to discuss."

Principal Tuminaro replied at 12:04 pm:

"...my assistant principal had programmed Jessica for adjoining room, C-212 A and B. These rooms have a doorway that is literally separated by no more than 5 feet. In addition, it is just a short distance from the English Department office and elevator. She will have little or no traveling to do. I will also make certain that she has a locked cabinet or closet for storage. As for elevator access, all teachers have access to the elevator in the building..."

On September 17, 2007, Ms. Roth wrote at 9:37am:

"Any update on Jessica Peterson's accommodation?"

Principal Tuminaro replied that evening at 7:24 pm:

"I met with Jessica today. I have directed my Assistant Principal to reprogram several teaching rooms to accommodate Jessica. I informed Jessica that within few days, the accommodation as per your email will be enacted."

DOE 25, pages 9-10.


He recalled having a conversation with the Respondent telling her that the accommodations would be taken care of. T. 673. He averred that the first time he saw an

accommodation letter with six points was when it was shown to him by counsel prior to his testimony in the instant hearing. T. 675. He testified that two things caught his eye as very, very difficult to facilitate. The first was not having to share a classroom with other teachers, noting that the school had 200 teachers and 4000 students, so teachers invariably had to share classrooms. He would not say that it could not happen in a particular term, but it would be very, very difficult. He further testified that it would be difficult to imagine a teacher avoiding hall passing. He defined avoiding hall passing as not having to walk in the hall while the students were walking. T. 678-679.

Mr. Tuminaro also identified the school room grid, corroborating AP Reynolds testimony as to the fact that it demonstrated the utilization of the classrooms in a given year. Looking at the grid, he noted that while the Respondent did not share a classroom during the 2011-2012 school year, during his tenure, she shared one during the 2008-2009, 2009-2010, 2010-2011 and 2012-2013 school years T. 681-687, DOE 32.

On cross-examination, he recalled having conversations with the Respondent and Ms. Roth prior to his receipt of the e-mail, but he did not recall a meeting. T. 690. He also agreed that the second bullet in Ms. Roth's September 6, 2007 e-mail included carrying no books, and that arrangements were made so that the Respondent did not have to get her own proctoring materials for the Regents exams. T. 692, 695. He also admitted that he assigned her to two connected rooms to minimize the amount of hall passing she would have to do. T. 693.

He testified that during his time at Tottenville, he saw less than ten accommodation letters in a fourteen year period. The Respondent's stood out because he had a very nice professional relationship with the Respondent, and he recalled that she broached the subject and it did not seem like something he could not manage. The accommodations were not

burdensome, he just needed time. T. 697-698. He reiterated, however, that not sharing a classroom would pose a burden to the school, as would avoiding hall passing insofar as there are all kinds of factors that go into when a teacher would be in the hallway. T. 705.

The Respondent testified that she sustained a line of duty injury in 2002. She described her conditions as permanent. She made her first accommodation request informally to AP Catherine Burgos in early June of 2007.   AP Burgos denied the request and as a result, the Respondent submitted an application to the Department. T. 1004-1007.

The Respondent identified her application form dated June 26, 2007. DOE 25, page 3. T. 1008. She made the specific accommodation requests: 1) to have a permanent classroom; 2) no changing of classrooms; 3)no carrying belongings back and forth; and 4) a secure closet and cabinet for storing belonging, and to avoid lifting teaching materials. T. 1009. She also submitted a statement from her orthopedist as to what she needed. T. 1012-1013. DOE 25, page 5.

After she submitted the application and supporting documents, she was alerted in September, 2007 that there were negotiations between DOE Medical and the school.  Ms. Roth had reached out to her on or about September 6, 2007, and they had multiple conversations. T. 1014-1015. She stated that she told Ms. Roth that with her injuries, being out in the hallway with children passing placed her in harm's way.  T. 1016. She also reiterated that she had a ton of paperwork, so having a somewhere secure to place her belongings would be helpful.  At the time, elevator access was not allowed for everyone. T. 1017. She identified the letter Dr. Suarez had her give to the Medical Division with the additional information. DOE 25, page 8.  T. 1018.

The Respondent testified that she kept notes of her conversation with Ms. Roth which indicated that the Respondent was told about the two classrooms being about two feet apart. She testified that she was angered because she did not feel that they were taking her situation

seriously and spoke to Roth about suing the Department. T. 1019-1020.

The Respondent testified that on September 12, 2007, her doctor had requested that she have a classroom by herself. She had a conversation with Principal Tuminaro around September 17. T. 1002. She received a letter at her home in mid to late September. The letter listed six accommodations in bulleted form. T. 1024, 1025. Respondent Exhibit 8. She could not say whether she received a photocopy or the original of the letter. T. 1025. She had no idea if she had the original letter she received in the mail in September, 2007. T. 1027. She never received a different version of the letter in the mail.

In January, 2017, she received a copy of her medical file because she felt her accommodations were not being honored. This was the first time she saw the three point letter. T. 1028-1030. DOE 7, page 32.

The Respondent also testified as to the accommodations she had been provided over the years. In the 2007-2008 school year, she was provided the same classroom for all her teaching assignments. T. 1030. After she received the letter (Respondent Exhibit 8), she did not share a classroom with anyone else and was provided with a secure locked cabinet to avoid carry teaching and testing supplies and materials. T. 1029-1030. That same year, proctoring materials were delivered to her. T. 1032. She was advised by the administration that because they put her in C212A, the small alcove that separated the classrooms did not provide much passing room, she was to stay in the room and not to come out during hall passing for fear that she would be injured. She was issued an elevator card. T. 1033-1034. From 2008-2009, until the end of the 2014-2015 school year, she was assigned to the same classroom. T. 1048. She shared the classroom with other teachers, but she testified that she had taken a great deal of corrective measures, so the accommodation was more than sufficient to get her job done. She would often

not vacate the classroom while the other teacher was teaching. T. 1049-1050.

When the school was re-organized in the 2015-2016 school year, her classroom assignment changed, and she was moved to the third floor. She noted it was "kind of far away from the elevator," and a real challenge to get to the union office. She was not the only teacher assigned to teach in the classroom that year. She stated that staying in her classroom while the other teacher taught became "problematic." She was told she could not stay behind during periods 7 and 8, even though the class consisted of only ten children. According to the master list of classroom assignments for the 2015-2016 school year, approximately thirty teachers did not share a classroom. Respondent Exhibit 9.The Respondent averred that she still had a locked cabinet, proctoring materials delivered to her and elevator access. She did not do hall passing in the 2015-2016 school year, and waited behind until the hall was clear. T. 1060. She characterized her accommodations as "mostly consistent," and she was "fairly satisfied" until she got push back at the end of the year. T. 1054-1061.

The Respondent testified that her physical condition worsened toward the end of the 2015-2016 school year. Consequently, Sue Shapiro, one of the union delegates at the school, spoke to AP Reynolds during the summer of 2016. After her conversation, Ms. Shapiro advised the Respondent to send AP Reynolds an e-mail and attach the accommodations. T. 1063-64. The Respondent did so on August 22, 2016, attaching the six point accommodation letter. DOE 21.

She received no response, but her accommodations changed "heavily." The union office was moved and her program was structured in such a way that she had to carry her belongings and teaching materials during hall passing. T. 1068-1069. She shared a classroom in 2016-2017 with multiple people. T. 1069. She was told at the beginning of the school year that she was not allowed to stay in her room. T. 1070. The master room grid for the 2016-2017 school year

demonstrated that thirty teachers did not share a classroom. T. 1071. Respondent Exhibit 10.

On September 7, 2016, the Respondent spoke with AP Bloom about her accommodations. After she and the teachers with whom she was to share a classroom approached Mr. Esposito in the program office, AP Bloom told her she needed to resubmit all of her documentation to DOE Medical for review. He told her that her accommodations would not be honored in the interim. Two days later, she had a meeting with Principal Scarmato concerning the accommodations. T. 1073.

She testified that her orthopedist examined her and said she needed accommodations in addition of the six she had been receiving. She submitted the medical documentation to the Medical Division during the week of October 10, 2016 which was when she had a conversation with Mr. Darien. T.1076. DOE 25, Pages 15-18.

The Respondent stated that during her conversation with Mr. Darien, he told her that he could not understand why her accommodations would not have been honored considering her case was not open nor even under review. He told her to reach out the Office of Equal Opportunity. She reached out to multiple agencies because she felt she was discriminated and retaliated against, and harassed. T. 1079-1080. Mr. Darien told her that if her case was under review, she would have received some official communication. She also described her condition to him, and asked if the Department would continually harass people and ask them to continually turn in their paperwork. Mr. Darien replied that that would be a permanent injury, and it would be cruel to do that to someone. The Respondent testified that she took copious notes during the conversation. T. 1082.

Mr. Darien testified on rebuttal that he may have made comments regarding the nature of the original accommodation and whether they said they were chronic or as a result of injuries.

He would not have rendered an opinion as to her specific medical condition or as to what accommodations she would have been entitled to. He denied that he would have made a comment such as "that would be cruel to do to somebody." T. 1265. He stated that he had a recollection of having conversations with her and explaining and answering questions that she may have asked him. T. 1266.

The Respondent became aware of the allegation against her on March 2, 2017 when she was asked to speak with investigators. T. 1091-1092. She stated that she did not have union representation. T. 1093. She was asked for the original letter and told the investigator that she had moved and had purged a lot of documents. T. 1097. When asked to explain why there might be two letters, she stated that the first time she saw the three point letter was when she requested her medical file. T. 1096. "I was afraid if anyone caught wind that that's what I was looking for things might mysteriously disappear." T. 1095-1096. She received the file in January, almost the very start of February. T. 1096.

The Respondent denied that she ever received an accommodation letter with three bullet points. She denied falsifying an accommodation letter, submitting an accommodation letter that she altered, submitting a document she knew contained false information or requesting an accommodation to which she knew she was not entitled. T. 1102. It was clear to her that after her discussion with Mr. Darien, she was always entitled to those six accommodations. T. 1103.

On cross examination, the Respondent admitted that the 2007 accommodation request that was typed was slightly different than that which had been hand written. She also admitted that, informally in June, 2007, her doctor had asked for the same accommodations as listed in the three point letter. T. 1124. Although she did not recall receiving a document from the Medical Division requesting additional information, Dr. Suarez's office sent a letter dated August 27,

2007 with respect to the accommodations that he requested she receive. T. 1125-1128. The Respondent stated that Dr. Suarez meant that she should not share a classroom when he said she should be stationed in one office. T. 1129. The Respondent admitted that she shared a classroom in the 2008-2009, 2009-2010, 2010-2011, 2012-2013, 2014-2015, 2015-2016, and 2016-2017 school years. T. 1130. She also admitted that not sharing, no hall passing, and delivery of proctoring materials were not specifically enumerated in her request. T. 1133. She never amended the accommodation request set forth on pages 3-4 of DOE 25. T. 1134. She also admitted that she did not make the three additional accommodations requests in her letter faxed on September 10, 2007. T. 1134. DOE 25, page 7.

On re-direct, the Respondent explained that she had a classroom to herself the first year, and that "changing classrooms" meant being in a classroom all day long by herself and not going into the hallway – it covered both items. T. 1205-1207. She stated that it seemed that the Medical Division had no idea themselves what was issued in 2007. T. 1209.

**Opinion**

At the outset, it should be noted that the decision in this set of specifications turns not on what accommodations the Respondent may have desired or needed in 2007 or 2016. Nor does it turn on whether, during the period between 2007 and 2016, the Respondent received certain accommodations *de facto*. The inquiry herein is whether the Respondent created or possessed or submitted a forged document with the intent to obtain medical accommodations to which she was not entitled. In order to prevail, the Department must prove, by a fair preponderance of the evidence, that the Respondent committed the alleged conduct. As such, it must show that it is more likely than not that the events occurred as alleged by the Department.

The Respondent is correct that insofar as she did not testify, there is no direct evidence

that Ms. Joseph did not sign the six point letter. However, it is well-settled that a hearing officer is permitted to consider and rely upon circumstantial evidence within the context of an Education Law Section 3020-a proceeding. See eg. Clayton v. Board of Education of the CSD of Conklin, 49 AD2d 343, 351 (3d Dept, 1975). See also, Dunn v. NYCDOE, 2001, NY Slip Op 515056.

A review of that evidence demonstrates the following: the Respondent was injured in 2002 and requested a medical accommodation in a document dated June 26, 2007. In that document, she made the following requests: 1) a permanent classroom; 2) no changing classrooms; 3) no carrying belongings back and forth; 4) a secure closet and cabinet for storing belongings to avoid lifting teaching materials. DOE 25, pp 3-4. She submitted a doctor's note which recommended a permanent classroom, no changing classes, no carrying belongings back and forth. DOE 25, p 5. The Medical Division in August, 2007, asked her doctor to opine as to why the Respondent could not travel from classroom to classroom using the elevator and transporting material via a cart. DOE 25, 6. He wrote: "…She is unable to change classes due to the amount of students. Although she uses an elevator to get to the floor where the classrooms reside, an elevator is not sufficient to manipulate through a plethora of classrooms, in a hallway which houses over 1,000 students; especially not via a cart being pushed and shoved… she should basically be stationed in one office." DOE 25, 8. Although no hall passing is hinted in Dr. Suarez's submission, there was no specific reference in the Respondent's request for accommodation as to no hall passing. This was addressing the question as to why she could not change classes using a cart. Further, there was never a request made by the Respondent to have teaching materials delivered to her. While "no carrying belongings back and forth" hints that the Respondent would have wanted as much, there was no specific request for delivery of materials. Further, the Respondent requested one secure closet cabinet so she could avoid lift teaching

materials. The Respondent did not mention multiple cabinets, nor did she mention delivery of testing materials or other supplies in her 2007 request. Finally, there is no mention of not sharing a classroom.

After the request was made, Ms. Roth e-mailed Principal Tuminaro to tell him that the Medical Division had determined to offer the Respondent the three accommodations which were offered in the three point letter. Although Principal Tuminaro mentions that due to the proximity of two rooms, she will have little or no traveling to do, that statement does not address hall passing. The Medical Division's determination was that she have the same classroom. Ten days later, the Principal advised the Medical Division that the school would provide the three accommodations which it granted: same classroom for teaching assignments, a secure locked closet, and elevator access. The e-mails make no reference to delivery of materials, hall passing, or that the Respondent would not share a classroom. These facts – the requests which the Respondent made in 2007, and the manner in which the Medical Division and the school granted those requests in 2007 - lend credence to authenticity of the three point letter.

Also of note is the testimony of Principal Tuminaro, with whom the Respondent apparently had a good relationship and who the Respondent characterized as generous and willingly compliant as to her accommodations. Principal Tuminaro testified credibly that, as the administrator in such a large school, he could not have accommodated a request of no hall passing or not sharing a classroom. Given that he expressed to Ms. Roth the difficulty in ensuring that the Respondent would have only one classroom, it is logical to assume that Principal Tuminaro would have expressed his concerns as to no hall passing and not sharing a classroom to Ms. Roth. The Respondent's argument that there are teachers who do not share a classroom does not serve to undermine the Department's assertion that to guarantee such an

accommodation would be difficult.

The facts indicate that the Respondent shared a classroom for at least seven school years between the 2007-2008 and 2016-2017 school years. There is no evidence that the Respondent brought this purported violation to the attention of Principal Tuminaro. The Respondent attempted to explain this at the hearing by stating that she was allowed to remain in the classroom during her free periods, a practice which the Respondent stated Principal Scarmato ended. Given the Respondent's testimony concerning her conversations with Ms. Roth as to the urgent need of her accommodations and her threatening of litigation, I find that the Respondent's explanation does not have the ring of truth. Further, the Respondent's 2016 accommodation request states that she made Principal Scarmato aware on September 9, 2015 that "packing up and rushing out" led to exacerbation of her injuries, but there is no indication that the Respondent provided the principal documentation in 2015 which would have substantiated her entitlement. In sum, the Respondent's failure to attempt to enforce the "no sharing of classroom" prior to 2016 again leads to the conclusion that such an accommodation was never granted.

The original letter was sent to the Respondent. Copies were sent to Principal Tuminaro, Gene Rubin at the UFT, Bill Brewton at OEO and one was kept in the Respondent's medical file. The witnesses from the Medical Division and the Office of Equal Opportunity credibly testified as to what was contained in their respective files – the three point letter. They also testified credibly as to the manner in which the letter would have been sent out. As noted by the Department, a letter properly addressed, stamped and mailed is presumed delivered. Thus, it is more likely than not that the three point letter in the OEO and Medical Division files was duly delivered to the Respondent.

Moreover, Principal Tuminaro testified credibly that he recalled seeing the three point

letter, but had no recollection of the six point letter. The Respondent asserts that it is likely Principal Tuminaro and the Respondent received the six point letter, and both the Medical Division and OEO never filed the six point letter and filed the three point letter in error. This would also explain, according to the Respondent, why there was no indication that the six point letter had the word "Amended" on it. Based upon the evidence presented – particularly the testimony of Principal Tuminaro and his e-mail exchange with Ms. Roth, this scenario is implausible.

I also reject the Respondent's assertion that due to multiple copies being made of both letters, it is not possible to fairly compare the signature of Ms. Joseph. Although the Department did not call a handwriting expert, the untrained eye can easily observe that the signatures are identical. Not only are the letters in the signature the same, but of particular note is that they touch the closing salutation and typed signature line at exactly the same place. Insofar as the Medical Division did not use a rubber stamp of Ms. Joseph's signature, I would be required to accept that Ms. Joseph signed her name precisely the same way twice. Given the evidence, this argument cannot be accepted.

Finally, despite the strained relationship between Principal Scarmato and the Respondent, I note that this matter was called into SCI for investigation independent of the principal, by both Ms. Zaza and Ms. Dombrow.

Turning now to the particular specifications, Specification One alleges that the Respondent in September, 2007 intentionally created, possessed and submitted a forged document. There was no evidence that the document was created, possessed or submitted in 2007. In fact, Principal Tuminaro testified that he did not recall seeing the six point letter until he was called about the instant charges. Therefore, Specification One is dismissed. As to

Specification Two, this specification is premised upon the assertion that the Respondent submitted a document in 2007 in order to obtain accommodations to which she was not entitled for the period of 2007 through 2016. As there is no evidence that the Respondent submitted a forged document in 2007, this specification must also be dismissed.

Specification Three is sustained. The Department has demonstrated by a preponderance of evidence that the Respondent in her August 22, 2016 e-mail submitted a forged document containing false information to Principal Scarmato with the intent to defraud the Department by improperly obtaining medical accommodations to which she was not entitled.

The documentary evidence demonstrates that the Respondent submitted the six point letter to the Medical Division in October, 2016, when she submitted a new accommodation request. DOE 25, p. 19. There was no testimony that the Respondent submitted the document on October 17, 2017, but the cover letter from the Respondent states October 7, 2016, and the Respondent testified as to her conversations with Mr. Darien. Based upon the record evidence, the Department has demonstrated that on or about October 17, 2016, the Respondent intentionally submitted a forged document containing false information to the Medical Division with the intent to defraud the Department by obtaining medical accommodations to which she was not entitled. Specification Four is sustained.

**Penalty**

The Department urges termination in this case. It maintains that given these offenses, it would be inappropriate to consider any mitigating factors. The Respondent argued that given the Respondent's long tenure and lack of disciplinary history, a penalty less than termination is appropriate.

As an initial matter, it should be noted that were the charges limited to the Respondent's

inappropriate classroom comments, only a minor penalty would be appropriate. However, given the extremely serious nature of the allegations of which the Respondent has been found guilty concerning submission of a falsified document, a very serious penalty must issue. The falsification of a document calls into question the ability of the employer to trust an employee. I have carefully considered the authority presented by the Department which notes that this fundamental breach requires termination of the employee.

The Respondent has evinced a serious lapse in judgment. It may have been that she genuinely believed that she was entitled to not in pass in the halls, and to be able to remain in her classroom all day, and that the principal was unwilling to recognize the hardships she faced at work. Whatever the motivation, the record is clear that she submitted a false document in order to obtain the accommodations to which she believed herself entitled, but which were not, in fact, directed by the Department. For this action, there must be serious consequences. I decline to accept, however, that the Respondent's tenure and lack of disciplinary record should be disregarded in this instance. The cases cited by the Department concern theft of money or time by the respondents. This consideration is not present in the instant case. Nor did the Respondent falsify documents which impact the education of students. Nevertheless, given the gravity of the conduct with which the Respondent has been found guilty, she is to be assessed a fine in the amount of $20,000 (twenty thousand dollars), to be paid in equal installments over a twelve month period.

## AWARD

i)  As to the first set of specifications, SED No. 31465, Respondent is guilty of Specification One, (c) and Specification Two.

ii)  As to the first set of specifications, SED No 31465, Respondent is not guilty of Specification One, (a), (b), (d), (e), and (f), and Specification Three

iii)  As to the second set of specifications, SED No. 31998, the Respondent is guilty of Specification Three and Specification Four.

iv)  As to the second set of specifications, SED No. 31998, the Respondent is not guilty of Specification One and Specification Two.

v)  The appropriate penalty for the specifications of which Respondent is guilty is a fine in the amount of $20,000 (twenty thousand dollars) to be paid in equal installments over the course of twelve months.


Queens, New York
April 24, 2018

Mary J. O'Connell, Esq.
Hearing Officer

STATE OF NEW YORK)
                        ) ss.:
COUNTY OF QUEENS )

I, Mary J. O'Connell, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

April 24, 2018

Mary J. O'Connell, Esq.